UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ALL STAR CARTS AND VEHICLES,
INC., H.B. MILLWORK, INC., and
ELECTRONICS COMPANY, INC., on
behalf of themselves and all others similarly
situated,



MEMORANDUM AND ORDER

                Plaintiffs,               CV 08-1816

   -against-                      (Wexler, J.)

BFI CANADA INCOME FUND, IESI
CORP., IESI NY CORP., WINTERS BROS.
RECYCLING CORP., WINTERS BROS.
WASTE SYSTEMS, INC.,

                Defendants.
----------------------------------------------------------X
APPEARANCES:

    LEWIS JOHS AVALLONE AVILES, LLP
    BY: JAMES F. MURPHY, ESQ.
    Attorneys for Plaintiffs
    425 Broad Hollow Road, Suite 400
    Melville, New York 11747

    REESE RICHMAN LLP
    BY: MICHAEL R. REESE, ESQ.
        KIM E. RICHMAN, ESQ.
    Attorneys for Plaintiffs
    875 Avenue of the Americas, 18th Floor
    New York, New York 10001

    GREENBERG TRAURIG, LLP
    BY: JAMES I. SEROTA, ESQ.
        RONALD LEFTON, ESQ.
        DANIEL J. BUZZETTA, ESQ.
    Attorneys for Defendants
    200 Park Avenue
    New York, New York 10166

WEXLER, District Judge:

This is an antitrust action stemming from Defendants' use of certain contracts in connection with the business of small containerized waste hauling services on Long Island. In a Memorandum and Order dated January 27, 2012, this court certified a class of both damage-seeking and injunctive-seeking individuals pursuant to Rules 23(b)(3) and 23(b)(2) of the Federal Rules of Civil Procedure. All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund, 280 F.R.D. 78, 86 (E.D.N.Y. 2012). The class period was recently defined as extending from May 5, 2004 through September 28, 2011. Plaintiffs, asserting claims on behalf of themselves and the class, are scheduled to proceed to trial with a claim of attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. §2 ("Section 2"). See All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund, 596 F. Supp.2d 630, 642 (E.D.N.Y. 2009). Presently before the court is Defendants' motion for summary judgment.

## BACKGROUND

### I. The Plaintiff Class and the Relevant Market

The plaintiff class includes "all persons and entities that have contracted with, and purchased small containerized waste disposal services in the relevant market directly from defendants from May 5, 2004 through September 28, 2011. (the "Plaintiff Class"). The relevant market is the market for "small containerized waste hauling and disposal services." That market encompasses the business of the lifting of small containers of waste for emptying into the storage section of a vehicle which then transports the waste to a disposal site. Such services are provided primarily to commercial customers including restaurants, apartment complexes and stores. These customers generate more waste than residences, but less than larger entities that would typically

2

utilize "roll-off" containers, i.e., containers that are transported to disposal sites and then returned to the customer. In contrast, the market here provides the service of transporting waste from small containers that remain on the customers' premises. Plaintiffs assert that there is no practical substitute for small containerized waste hauling. Therefore, customers of this service will not generally switch to a different type of waste disposal service, such as curbside pick-up, or roll-off containers, in the event of a price raise. The relevant geographic market is the Long Island, New York area.

II. <u>Defendants</u>

Defendants are BFI Canada Income Fund, a company that is now known as Progressive Waste Solutions, Ltd. ("Progressive"). Progressive is a Canadian business income trust with its principle offices in Toronto. The other named Defendants are Winters Bros. Recycling and Winters Bros. Waste Systems, Inc., which are New York corporations with their principle executive offices in Westbury, New York (collectively "Winters Brothers" or "Winters").

Winters Brothers is in the business of collecting and hauling residential and commercial waste in the relevant geographic market. In 2006, Winters acquired the Long Island assets of formerly named defendant Allied Waste Industries, Inc. In January of 2007, Winters acquired the Long Island assets of now-dismissed defendant Waste Management of New York, LLC. In or around August of 2007, IESI, a wholly-owned subsidiary of Progressive, acquired Winters.

III. <u>The Claim Remaining for Trial and the Motion for Summary Judgment</u>

The claim remaining for trial is an attempt to monopolize the relevant market in violation of Section 2 of the Sherman Act. Plaintiffs allege injury in the form of higher prices, reduced competition, innovation, and consumer choice. Defendants move for summary judgment arguing

3

that despite extensive discovery, Plaintiffs are unable to create a question of fact as to the "touchstone element" of a claim for attempted monopolization, i.e., the dangerous probability that Defendants will achieve monopoly power in the relevant market. After outlining relevant legal principles, the court will turn to the merits of the motion.

## DISCUSSION

I.  Standards on Motion for Summary Judgment

Courts use summary judgment "to isolate and dispose of factually unsupported claims," Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). When deciding motions for summary judgment the court is required to draw all reasonable inferences in favor of the non-moving party. Nonetheless, once the moving party demonstrates the absence of an issue of material fact, the party opposing summary judgment must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Morritt v. Stryker Corp., 2011 WL 3876960 *4 (E.D.N.Y. 2011), quoting, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587(1986).

Affidavits used in connection with motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c) (4); see Institute for Development of Earth Awareness v. People for Ethical Treatment of Institute for Development of Earth Awareness v. People for Ethical Treatment of Animals, 272 F.R.D. 124, 125 (S.D.N.Y. 2011); Degelman Industries Ltd. v. Pro-Tech Welding and Fabrication, Inc., 2011 WL 6752565 *3 (W.D.N.Y. 2011). While the identity of non-party witnesses may be discoverable prior to trial, affidavits of such witnesses, used in support of motions for summary judgment, constitute attorney work-product prior to filing and therefore need not be disclosed prior to the making of

4

the motion. Institute for Development of Earth Awareness, 124 F.R.D. at 125.

Summary judgment is recognized as an tool of particular importance in the context of antitrust actions, where it can avoid "wasteful trials and [prevent] lengthy litigation that may have a chilling effect on pro-competitive market forces." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95 (2d Cir. 1988); see Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 541 (2d Cir.1993).

II.     Section 2 Claim of Attempted Monopolization

Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and conspiracy to monopolize. 15 U.S.C. § 2. A claim of attempted monopolization requires a showing of three elements. Specifically, a plaintiff must show that the defendant: "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1933); Tops Markets, Inc. 142 F.3d at 99-100; In re Payment Card Interchange Fee and Merchant Antitrust Discount Antitrust Litigation, 562 F. Supp.2d 392, 398 (E.D.N.Y. 2008) (hereinafter "Payment Card Litigation").

While the Second Circuit has noted that proof of the first element, i.e., anti-competitive conduct, may be used to "infer" a specific intent to monopolize, the element of a dangerous probability of success in achieving monopoly power must be separately established. Volvo North America Corp. v. Men's Intern. Professional Tennis Council, 857 F.2d 55, 74 (2d Cir. 1988). That is because in the absence of monopoly power, even the specific intent to drive another company out of business, coupled with arguably tortious conduct in furtherance of that objective, are not enough to sustain an antitrust claim of attempted monopolization. International

Distribution Centers, Inc. v. Walsh Trucking Co., Inc., 812 F.2d 786, 788 (2d Cir. 1987). Indeed, even "strong evidence" of the first two elements of a Section 2 claim cannot substitute for a showing of a dangerous probability of achieving monopoly power. Id. at 791-92. Establishing a triable issue of fact as to a dangerous probability of achieving monopoly power is therefore necessary to overcome a motion for summary judgment. See AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 226 (2d Cir. 1999).

Monopoly power, a term used interchangeably with "market power," see International Distribution Centers, Inc. v. Walsh Trucking Co., Inc., 812 F.2d 786, 791 n.3 (2d Cir. 1987), is defined as "the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 389-91 (1956); Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 97-98 (2d Cir. 1998); Payment Card Litigation, 562 F. Supp.2d at 399. Monopoly power can be demonstrated directly by showing the power to set prices or exclude competition, or indirectly, by showing defendant's large percentage of market share. See Tops Markets., 142 F.3d at 98.

When used in the context of establishing monopoly power, the term "power to control prices," refers to the control of prices in the relevant market, and not to the power to set prices that are charged to the defendant's customers. Thus, the power to contractually control prices paid by a company's customers does not translate to the power to control market prices -- the essence of monopoly power. See United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 393 (1956) (power to control the price of a manufacturer's own product "is not the power that makes an illegal monopoly").

Similarly, a contractual provision that provides for an arrangement of even long-term

6

exclusivity does not, standing alone, establish the "power to exclude competition" within the meaning of the antitrust laws. If that were the case, every contract providing for exclusivity of any manner would run afoul of those laws. Thus, while the court may consider the effects of contract power, including long terms of exclusivity and price escalation, "courts must attempt to ascertain a defendant's economic position in the relevant market, rather than its power pursuant to a particular contract, when considering whether a defendant has market power." Maris Distributing Co. v. Anheuser–Busch, Inc., 302 F.3d 1207, 1219 (11th Cir. 2002); accord United Farmers Agents Assoc, Inc. v. Farmers Ins. Exchange, 89 F.3d 233, 236–37 (5th Cir.1996).

Market share is evidence of market power. Payment Card Litigation, 562 F. Supp.2d at 400. While it is clear that the absence of market power negates a claim of attempted monopolization, it is also clear that when considering the likelihood of achieving monopoly power, the court considers defendant's relevant market share in light of other market characteristics, including the number of market competitors, barriers to entry and the likely development of the market. AD/SAT, 181 F.3d at 226; see Walsh Trucking, 812 F.2d at 791.

Thus, while important to establish, market share is insufficient, standing alone, to determine the issue of market power. See Tops Markets, 142 F.3d at 99 (market share evidence not conclusive on issue of monopoly power). Nonetheless, the Second Circuit has noted the overriding importance of market share in certain cases. That court has commented that, in the absence of additional factors, a market share of 33% "does not approach the level required for a showing of dangerous probability of monopoly power." AD/SAT, 181 F.3d at 229 (quoting favorably treatise reference that in the absence of other anti-competitive factors "[i]t would appear rather difficult to establish the dangerous probability element where a defendant holds

less than a 40% share of a market . . . ."); see also Natsource LLC. v. GFI Group, Inc., 332 F. Supp.2d 626, 635 (S.D.N.Y. 2004) (market shares of approximately 50% insufficient to demonstrate market power when coupled with other pro-competitive factors such as low barriers to entry and strong competition).

III.   Evidence Submitted on the Motion

As noted, Defendants' summary judgment motion argues, in chief, that Plaintiffs can show no question of fact as to whether there is a dangerous probability that Defendants will achieve monopoly power. In support of their motion, Defendants submit deposition testimony, affidavits, declarations and other documents. Plaintiffs rely on similar types of evidence. The parties' evidence relate to the contracts at issue, market share, and other market factors including the level of competition and barriers to entry. The court summarizes that evidence below.

   A.   The Contracts

At the core of Plaintiffs' attempted monopolization claim are contractual provisions binding customers, including members of the Plaintiff Class. The allegedly anti-competitive provisions in such contracts are terms of between three and ten years, along with provisions for automatic renewal. These renewal provisions require customers to give notice of termination at least ninety days prior to the end of a term. Also identified as anti-competitive are liquidated damages provisions, and "right to compete" clauses that require customers to give Defendants a reasonable opportunity to respond to any competitor's offer. The court refers to such contracts herein using Plaintiffs' term, "Evergreen Contracts."

As to Defendants' use of Evergreen Contracts, Plaintiffs submit certain of Defendants' company documents stating, at the time of its acquisition by Progressive's predecessor, that more

than 80% of Winters Brothers' customers did business with the company pursuant to contract, and that such contracts were "typically 7 years in length." Plaintiffs also present evidence tending to show that certain of Winters Brothers' customers are unhappy with their contractual agreements, and that Defendants aggressively enforce their contracts. Thus, Plaintiffs have submitted letters sent by Winters Brothers to customers that reject the customers' attempts at early termination of Winters Brothers' contracts.

Plaintiffs also rely on Winters Brothers' commencement of breach of contract actions in New York State courts seeking to enforce their contracts with customers. With respect to one such lawsuit, Plaintiffs refer to the opinion of the court in the case of <u>Winters Bros. Recycling v. Barry Imports East Corp.</u>, 23 Misc.3d 1115, 885 N.Y.S.2d 714 (N.Y. Dist. Ct. 2009). In that case, Winters Brothers sued to enforce its contract and the customer argued that the contract should not be enforced because it was unconscionable and obtained by deceit. The state trial court agreed that the contract was unconscionable and there was no "meeting of the minds" as to terms contained on the back page of the contract.[1]

Defendants, noting that this is an antitrust case and not one for breach of contract, make no apology for enforcement of what they believe are valid contracts. Additionally, Defendants submit evidence that the terms of the pre-printed contract relied upon are subject to negotiation. In support, Defendants submit declarations of five customers that have contracted with Winters Brothers. Those customers entered into contracts with Winters Brothers between 2006 and 2011.

---

> The Appellate Term of New York's State Supreme Court subsequently reversed the decision on the ground that after a bench trial, but before judgment was rendered, the parties advised the district court that they had reached a settlement. The Appellate Term therefore vacated the judgment. <u>Winter Bros. Recycling Corp. v. Barry Imports East Corp.</u>, 926 N.Y.S.2d 348 (App. T. 2011).

Three of the contracts were for a seven year term, one is for a six year term, and the most recent is for a term of three years. Each customer declaration speaks to the competitive nature of the waste removal business, and to the ability to negotiate terms and prices that vary from the printed form of contract at issue here.

Defendants also submit declarations of ten of their competitors in the relevant market. The declarations are made by owners of companies that have been identified, during the course of discovery, as market competitors and their declarations were exchanged during expert discovery. Because the declarations contain confidential business information about each competitors' business, they have been filed under seal. Nonetheless, the declarations have been supplied to the court and, as noted, to Plaintiffs. Each declaration is made on personal knowledge by owners of companies that compete directly with Winters Brothers. Each states the substance of testimony that, if called upon, will be presented at trial.

Nine of the ten competitors state that they use form contracts containing the same or similar provisions to those at issue here. They refer to these contracts as in common industry use, particularly the term providing for automatic renewal. Moreover, the competitor declarations state that despite the use of form contracts, term negotiation is common in the industry.

In support of the argument that the Evergreen Contracts are anti-competitive, Plaintiffs note that while such contracts are not illegal in the relevant market, they are not permissible for use in the City of New York. Specifically, Plaintiffs refer to New York City Local Law 42 ("Local Law 42"), which provides strict licensing requirements and also, <u>inter alia</u>, limits the terms of private hauling contracts to a period of two years, giving customers the right to terminate assigned contracts within three months of their assignment. <u>See Sanitation and</u>

Recycling Industry, Inc. v. City of New York, 107 F.3d 985, 991-92 (2d Cir. 1997).

Defendants note that Local Law 42 law was enacted in response to particular criminal activity in the New York City carting industry, and has no application to the relevant market here. In particular, Defendants note that the law was passed only after an investigation by the New York City Police Department and the Manhattan District Attorney's office. That investigation uncovered a "pattern of racketeering and corruption in the New York City carting industry." Id. at 990. Among other findings that led to the enactment of the New York City law were charges that competition was restrained in New York City "by acts of violence including attempted murder, assault and arson . . . ." Id.

Plaintiffs also support their claims as to the anti-competitive effects of Evergreen Contracts on the market by reference to the testimony of Jerry Amato, ("Amato") a former Winters Brothers sales manager now employed by a competitor. When questioned at his deposition as to what impact he thought that Evergreen Contracts have had on competition on Long Island, Amato replied that the contracts make it hard for competition because "if the largest company on the Island has all the customers locked in with seven-year contracts, it makes it difficult for the small companies to grow." Additionally, when questioned as to whether, in his view, the use of such contracts allowed Winters Brothers to monopolize the market and exclude competitors, Amato agreed. Briefly stated, Defendants dismiss the Amato testimony as inadmissible lay testimony offered in support of conclusions requiring an expert opinion.

B. Market Share Evidence

As to market share evidence, it is important to note first that an April 27, 2012 Memorandum and Order of this court, affirming a ruling of Magistrate Judge Tomlinson,

11

precludes Plaintiffs' expert, Dr. Barbara Stevens, Ph. D., from offering any opinion as to market share. Nonetheless, several documents referring to market share produced by both sides are before the court.

Similar to their evidence with respect to the alleged anti-competitive effects of Evergreen Contracts, Plaintiffs support their claims as to the market share of Winters Brothers' market share by relying on the Amato testimony. Thus, Plaintiffs note that Amato agreed with counsel's characterization of Winters Brothers as a big company, referring to it as "the monster." In Amato's view, Winters Brothers was "probably four times the size," of its nearest competitor.

More particular market share evidence is set forth in the complaint, which alleges a 65% market share, and in Plaintiffs' October 29, 2010 responses to interrogatories. Those responses state Plaintiffs' position that prior to the 2007 acquisition of Winters Brothers by IESNY, no Defendant other than Winters Brothers was operating in the relevant market, and Winters Brothers market share was, at that time, no more than 10% of the market. Plaintiffs also cite to Defendants' documents generated in connection with the 2007 acquisition of Winters Brothers, including a document entitled "Executive Summary of the proposed acquisition by IESNY of Winters Brothers Waste Systems, Inc." (the "Executive Summary"). When describing the "Competitive Landscape" of the Long Island market, the Executive Summary lists Winters Brothers as controlling a 39% market share. Its closest competitor, identified as "Jamaica Ash," is noted to control 25% of the relevant market, with other competitors controlling less than 10% shares of the relevant market. A second Executive Summary of the due diligence conducted in connection with the acquisition indicates that both Winters Brothers and Jamaica Ash control approximately 35% of the relevant market, with the remainder of the market consisting of

smaller competitors.

Later interrogatory responses assert that after the acquisition, Winters Brothers' market share was 59% for the years 2006-2007; 65% for the year 2008; and 69% for the years 2009-2010. Ernest Kussmaul ("Kussmaul"), Plaintiffs' witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, was asked to substantiate Plaintiffs' contentions as to market share percentage. Kussmaul could identify no source for the 65% market share identified in the complaint. As to the percentage shares set forth in the 2010 responses to interrogatories, Kussmaul testified that those numbers were derived from "tables," listing the volume of business in the relevant market. A place was left in the record for Kussmaul to identify the table to which he referred. A review of Plaintiffs' papers submitted in opposition to Defendants' motion reveals that the highest market shares claimed are the 35% and 39% references in Defendants' documents as referred to above. There is no evidence supporting the 59-69% shares indicated in the interrogatory responses.

C.  Evidence of Competition and Barriers to Entry in the Relevant Market

As to the identity of competitors, Defendants' responses to interrogatories list 89 companies that compete with Defendants, offering small containerized waste hauling and disposal services to consumers in Nassau and Suffolk during the Class Period. Plaintiffs identify 59 such providers. While Plaintiffs acknowledge these companies as market competitors, Plaintiffs state that no competitor can be characterized as "large," when compared to Defendants. It is Plaintiffs' position that Defendants' anti-competitive conduct, i.e., the use of Evergreen Contracts, has reduced, and will continue to reduce the number of competitors in the market over time.

As noted, Barbara Stevens, Ph.D., is Plaintiffs' expert. While Dr. Stevens has been precluded from offering evidence in support of any particular market share, her report does make reference as to whether or not there are barriers to entry in the relevant market. As to that issue, Dr. Stevens states that, with the exception of the presence of Evergreen Contracts, there are no significant technical or financial barriers to entry. Thus, the only barrier to entry identified by Dr. Stevens is the Evergreen Contract. When asked at her deposition about the precise impact of such contracts on competition, Dr. Stevens stated that while she constructed a model assessing the impact of such contracts on competition and prices, she could not isolate the effect of the use of such contracts by Defendants alone. Additionally, when asked whether she conducted a study leading to the conclusion that Winters Brothers had the ability to raise prices in the relevant market, Dr. Stevens replied that she had conducted no such study in the relevant market.

Defendants also rely on the competitor declarations referred to above to support their claims of robust competition and low barriers to entry. The declarations indicate that these competitors operate smaller businesses than that of Defendants. Nonetheless, each declaration characterizes the waste carting industry on Long Island as highly competitive and states that market participants often reduce prices to compete for customers. Each competitor denies that any one company can set industry prices and none believe that they are being excluded from the relevant market by Winters Brothers. Each declaration states each company's revenues during the Class Period. The declarations reveal that both the amounts of yearly revenue and number of customers stated for each competitor remained generally constant during the class period, with no precipitous drop-off in revenue, or diminution in number of clients.

IV.   Disposition of the Motion

Upon review of the extensive discovery taken in this matter and the submissions summarized above, the court holds that Defendants have more than met their burden of showing that no material issue of fact is present that precludes summary judgment on the single claim remaining for trial, i.e., that of attempted monopolization.

From the start, Plaintiffs' case has relied on the Evergreen Contracts coupled with the size of the Defendants' business in the relevant market to support their claim. Specifically, in the context of this motion, Plaintiffs make clear that they rely on such contracts to establish Defendants' ability to control prices and exclude competition. According to Plaintiffs, the contractual provisions alone establish these necessary elements by direct evidence and evidence of market share is therefore unnecessary. The court disagrees.

While the contracts at issue allow Defendants to control prices they charge their customers, there is no evidence that the contractual setting of prices also controls prices charged by competitors in the relevant market. To the contrary, Defendants have produced evidence that while Defendants are a large market competitor, their conduct does not control prices in the market as a whole. Plaintiffs fail to counter that evidence with anything more than the obvious fact that Defendants' contracts allow them to set the prices they charge their customers for service. This is a far cry from the ability to set prices in the relevant market.

The court reaches the same conclusion with respect to the allegations as to Defendants' ability to exclude competition. Again, Plaintiffs rely on the use of contractual provisions, specifically the automatic renewal and right of first refusal clauses, to show the power to exclude competition. Defendants have come forward with evidence to the contrary, showing that

competitors have not been excluded from entering the market, and that the businesses of these competitors has remained at steady levels during the class period. Such evidence includes evidence of low barriers to entry. Other than continuing to cite contractual terms, Plaintiffs come forward with no evidence that Defendants have been able to exclude competitors from entering the relevant market. Indeed, when excluding the effect of the renewal clauses even Plaintiffs' expert concedes that there are low barriers to entry.

Having rejected Plaintiffs' position that they have shown direct evidence of monopoly power by demonstrating at least a question of fact as to the ability to control price and/or exclude competition, the court considers whether Plaintiffs have made a sufficient showing of a dangerous probability of achieving monopoly power by indirect evidence, i.e., by on relying Defendant's market share. The court holds that they have not.

The court is mindful that no particular percentage of market share is dispositive. At the same time, as demonstrated above, market share is critical to evaluate when determining the key issue of whether there is a probability of success in achieving monopoly power. As to market share, the court notes that Plaintiffs' only evidence of market share lies the lay testimony of Kussmaul and Amato, and Defendants' internal, and informal, company documents generated in connection with the Winters Brothers acquisition. The Kussmaul and Amato testimony are wholly insufficient to establish market share. In essence, both of these lay witnesses do nothing more than testify as to their opinions that Winters Brothers is a large competitor in the market. Such testimony has little, if any value when determining the critical market share issue.

Defendants also dispute the right of Plaintiffs to rely upon market share percentages contained in informal acquisition documents. Defendants correctly note that such non-expert

evidence is of little value in establishing market share. They also argue, correctly in the court's view, that even assuming the veracity of the highest market share shown by this evidence, i.e., 39%, is insufficient to establish the probability of success in achieving monopoly power, especially when the next largest competitor is stated to have at least a 25% market share. The court reaches this conclusion based upon the percentage of market share as well as the evidence referred to above, i.e., evidence that fails to show the anti-competitive effects or exclusionary result of the disputed contracts.

For the foregoing reasons, the court holds that after the extensive discovery in this case, and construing the evidence in the light most favorable to Plaintiffs, Defendants have demonstrated the absence of a material fact as to whether there is a dangerous probability that they will achieve monopoly power in the relevant market. The evidence relied upon in support of the motion shows clearly that the contracts are often subject to negotiation, there are low barriers to entry and that there is competition in the relevant market. While Defendants are large competitors in the market, there is no evidence that their market share is sufficient, in light of all other evidence, to show the dangerous probability of achieving monopoly power.

Plaintiffs have failed to come forward with evidence showing there are any factual issues for trial. Instead, Plaintiffs have done no more than argue, without substance, what they have argued throughout this litigation i.e., that the Evergreen Contracts, when combined with market share, establish an antitrust claim. They do not. At best, Plaintiffs have established that many of Defendants customers are unhappy with their contracts, and that Defendants engage in vigorous enforcement thereof. Plaintiffs have also established that at least one lower state court agrees that the contracts are so unfavorable to the consumer as to be unconscionable. Additionally, Plaintiffs

show that many provisions of the Evergreen contracts are impermissible in the City of New York – a completely different market found to operate within a criminal enterprise.

In the context of this motion for summary judgment, Plaintiffs must do more than allege claims. Instead, in the face of a strong showing opposing their claims, Plaintiffs are required to come forward with evidence showing the existence of a question of fact. While Plaintiffs' evidence may have pushed this case beyond the motion to dismiss phase, it is insufficient, particularly the lack of market share evidence, to defeat summary judgment on this Sherman Act claim of attempted monopolization.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to terminate the motion for summary judgment as well as any other pending motions and to close the file in this matter.

SO ORDERED.

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
August 13, 2012